2010 OK 58

STATE of Oklahoma ex rel. W.A. "Drew" EDMONDSON, Attorney General of Oklahoma, Appellant,

v.

NATIVE WHOLESALE SUPPLY, a Corporation chartered by the Sac and Fox Tribe of Oklahoma, Appellee.

No. 107,241.

Supreme Court of Oklahoma.

July 6, 2010.

E. Clyde Kirk, Assistant Attorney General, Oklahoma City, OK, for Appellant.

Robert N. Sheets and Marc Edwards, Phillips Murrah P.C., Oklahoma City, OK, for

Appellee.[1]

OPALA, J.

¶ 1 This appeal presents two dispositive issues for the court's resolution: (1) Is an Oklahoma court a constitutionally sanctioned forum for the exercise of personal jurisdiction to adjudicate an alleged violation of a state statute by Native Wholesale Supply, a nonresident corporation that claims to have no minimum contacts with Oklahoma? and (2) Does federal law bar Oklahoma from enforcing the Complementary Act against Native Wholesale Supply, a tribally-chartered corporation wholly owned by an individual of Native–American ancestry? We answer the first question in the affirmative and the second in the negative.

## I

### THE ANATOMY OF LITIGATION

¶ 2 On 23 November 1998 forty-six states, including Oklahoma, entered into an agreement with the four largest American tobacco product manufacturers settling litigation brought by the settling states to recoup from the manufacturers health care expenses incurred by the states as a result of cigarette smoking. The terms of this agreement (the "Master Settlement Agreement" or "MSA") require each participating tobacco product manufacturer to make an annual payment to each settling state computed in relation to that manufacturer's volume of cigarette sales in the state. In return, the MSA requires the states to release past, present and certain future claims against the manufacturers.

¶ 3 In order to prevent tobacco manufacturers not participating in the MSA from gaining a cost advantage over the settling manufacturers and to provide the states with a source of money from which to recover tobacco-related health care costs attributable to the sales of cigarettes by non-participating manufacturers, the MSA calls for each settling state to enact and enforce a statute (a "qualifying statute") requiring all tobacco manufacturers not participating in the MSA who sell cigarettes in a state to make annual payments into an escrow account based on the manufacturer's relative market share in such state.[2]

¶ 4 Soon after passage of their qualifying statutes, it became clear to the states that non-participating cigarette manufacturers were evading their escrow obligation. Oklahoma, along with several other states, responded to this noncompliance by enacting complementary enforcement legislation. Known as the Master Settlement Agreement Complementary Act ("Complementary Act")[3], this legislation obligates all tobacco product manufacturers whose products are sold in Oklahoma to provide the Attorney General's office with an annual certification that the manufacturer has either signed on to participate in the MSA or is fully compliant with the qualifying statute's escrow requirement.[4] The Complementary Act requires

1. Identified herein are only those counsel for the parties who have entered an appearance in this cause (as required by Okla. Sup.Ct. Rule 1.5(a), 12 O.S.2001, Ch. 15, App.1) or whose names appear on the appellate paperwork.

2. *See* the provisions of 37 O.S. Supp.2003 § 600.23 for the terms of Oklahoma's qualifying statute, which is part of the Prevention of Youth Access to Tobacco Act, 37 O.S.2001 § 600.1 et seq.

3. *See* the provisions of 68 O.S. Supp.2004 § 360.1 et seq.

4. *See* the provisions of 68 O.S. Supp.2004 § 360.4(A)(1) which state:
 "Every tobacco product manufacturer whose cigarettes are sold in this state, whether directly or through a distributor, retailer or similar intermediary or intermediaries, shall execute and deliver on a form or in the manner prescribed by the Attorney General a certification to the Oklahoma Tax Commission and Attorney General, no later than April 30 of each year, certifying under penalty of perjury that, as of the date of certification, the tobacco product manufacturer either: (a.) is a participating manufacturer, or (b.) is in full compliance with the provisions of Sections 600.21 through 600.23 of Title 37 of the Oklahoma Statutes."
 The provisions of 37 O.S. Supp.2003 § 600.23, which set out the obligations underlying the certification requirement, state in pertinent part:
 "A. Any tobacco product manufacturer selling cigarettes to consumers within the state, whether directly or through a distributor, retailer or similar intermediary or intermediaries, after July 1, 1999, shall do one of the following:
 1. Become a participating manufacturer, as that term is defined in Section II(jj) of the Master Settlement Agreement, and generally perform its financial obligations under the Master Settlement Agreement; or
 2. Place into a qualified escrow fund, by April 15 of the year following the year in question, the following amounts, as such amounts are adjusted for inflation: ..."

the Attorney General's Office to publish on its website an annual list of all non-participating tobacco product manufacturers who have complied with the certification requirement[5] and met their escrow obligation.[6] This information is thus in the public domain and readily available.

¶ 5 The Complementary Act also makes it unlawful for any person to "sell or distribute ... or acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the State in violation of the Complementary Act."[7] Upon finding a violation of the Complementary Act, a court may order "any profits, gain, gross receipts, or other benefit from the violation to be disgorged and paid to the State Treasurer for deposit in the Tobacco Settlement Endowment Trust Fund."[8] The State, if victorious, is also entitled to recover costs and a reasonable attorney's fee."[9]

¶ 6 The Attorney General brought this proceeding against Native Wholesale Supply in the District Court, Oklahoma County, alleging that the Company violated the Complementary Act when it sold, distributed, acquired, held, owned, possessed, transported, imported, or caused to be imported for sale in Oklahoma Seneca brand cigarettes knowing (a) that they were intended for distribution or sale in the state and (b) their manufacturer was not listed on the Attorney General's Directory of manufacturers who have complied with the requirements of the Complementary Act.

¶ 7 Native Wholesale Supply moved for dismissal based on lack of personal and subject matter jurisdiction. The trial court ruled that Native Wholesale Supply had sufficient "minimum contacts" with the State of Oklahoma to warrant the exercise of personal jurisdiction, but dismissed the proceeding on the grounds that enforcement of the Complementary Act against Native Wholesale Supply would violate the Indian Commerce Clause of the United States Constitution.

¶ 8 Native Wholesale Supply has appealed from the trial court's decision on personal jurisdiction; the Attorney General has appealed from the trial court's ruling on subject matter jurisdiction. On motion by the State, the appeals stand retained for this court's disposition. We now affirm the trial court's decision as to personal jurisdiction, reverse its ruling as to subject matter jurisdiction, and remand the cause for further proceedings to be consistent with this opinion.

5. *See* the provisions of 68 O.S. Supp.2004 § 360.4(B)(1), which state:
 "Not later than ninety (90) calendar days after this act takes effect, the Attorney General shall develop and publish on its website a directory listing all tobacco product manufacturers that have provided current and accurate certifications conforming to the requirements of [this section]."

6. *Id.* at § 360.4(B)(3), which states:
 "Neither a tobacco product manufacturer nor brand family shall be included or retained in the directory if the Attorney General concludes, in the case of a nonparticipating manufacturer, that:
 a. any escrow payment required pursuant to Section 600.23 of Title 37 of the Oklahoma Statutes for any period for any brand family, whether or not listed by the nonparticipating manufacturer, has not been fully paid into a qualified escrow fund governed by a qualified escrow agreement that has been approved by the Attorney General, ..."

7. *See* the provisions of 68 O.S. Supp.2004 § 360.7(E), which state:
 "1. It shall be unlawful for a person to:
 a. sell or distribute cigarettes, or

 b. acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the state in violation of the Master Settlement Agreement Complementary Act. A violation of the act shall be a misdemeanor."

8. *See* the provisions of 68 O.S. Supp.2004 § 360.8(G), which state:
 "If a court determines that a person has violated the Master Settlement Agreement Complementary Act, the court shall order any profits, gain, gross receipts, or other benefit from the violation to be disgorged and paid to the State Treasurer for deposit in the Tobacco Settlement Endowment Trust Fund. Unless otherwise expressly provided, the remedies or penalties provided by the Master Settlement Agreement Complementary Act are cumulative to each other and to the remedies or penalties available under all other laws of this state."

9. *See* the provisions of 68 O.S. Supp.2004 § 360.8(F), which state:
 "In any action brought by the state to enforce the Master Settlement Agreement Complementary Act, the state shall be entitled to recover the costs of investigation, expert witness fees,

## II

## STANDARD OF REVIEW

■ ¶ 9 The dispositive issues to be decided are both questions of law. They call for a legal conclusion to be governed by a *de novo* standard of appellate review.[10] When reexamining a trial court's legal rulings, an appellate court exercises plenary, independent and non-deferential authority.[11]

## III

## IN PERSONAM JURISDICTION OVER A NON–RESIDENT DEFENDANT

■ ¶ 10 We begin by addressing whether Native Wholesale Supply has a sufficient affiliation with this State to support her courts' exercise of personal jurisdiction over it. *In personam* jurisdiction refers to the power of the court to render a binding judgment against a defendant.[12] To establish personal jurisdiction over a non-resident defendant, both the State's long-arm statute [13] and the requirements of federal due process [14] must be satisfied. We have interpreted our long-arm statute as extending the jurisdiction of the Oklahoma courts to the

outer limits of due process.[15] The jurisdictional analysis therefore comes down to a single determination of whether the exercise of personal jurisdiction comports with federal due process. The outer limits of due process for this purpose have been established by the United States Supreme Court.[16]

■ ¶ 11 The Due Process Clause precludes the issuance of a binding judgment in a forum with which a defendant has established no meaningful contacts, ties, or relations.[17] There must be "minimum contacts" between the out-of-state defendant and the forum so that litigation in the forum does not offend traditional notions of fair play and substantial justice.[18] A nonresident corporation must purposefully direct its activities toward forum residents, thereby invoking on behalf of those activities the benefits and protections of the forum's laws.[19] This requirement "ensures that a defendant will not be haled into a jurisdiction's courts solely as a result of random, fortuitous, or attenuated contacts" [20] or based on "the unilateral activity of another party or a third person." [21] Whether due process is satisfied depends upon the quality and nature of the defendant's alleged activity in the forum consid-

---

costs of the action, and reasonable attorney fees."

10. *Booth v. McKnight*, 2003 OK 49, ¶ 12, 70 P.3d 855, 860.

11. *Id.*, citing *Kluver v. Weatherford Hosp. Auth.*, 1993 OK 85, ¶ 14, 859 P.2d 1081, 1083 (stating that "[i]ssues of law are reviewable by a de novo standard and an appellate court claims for itself plenary, independent, and non-deferential authority to reexamine a trial court's legal rulings" and citing *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)).

12. *Gilbert v. Security Finance Corp. of Okla., Inc.*, 2006 OK 58, ¶ 16, 152 P.3d 165, 173; *Conoco Inc. v. Agrico Chemical Co.*, 2004 OK 83, ¶ 16, 115 P.3d 829, 834.

13. *See* the provisions of 12 O.S.2001 § 2004(F), which state:
 "A court of this state may exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States."

14. The Due Process Clause of the United States Constitution, U.S. CONST. amend. XIV, § 1, provides that no state shall ...'"deprive any person

of life, liberty, or property, without due process of law; ..."

15. *Conoco Inc., supra* note 12 at ¶ 17, 115 P.3d at 834 ("The intent of our long-arm statute is to extend the jurisdiction of the Oklahoma courts to the outer limits permitted by the Oklahoma Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.").

16. *Id.*

17. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985).

18. *Conoco, supra* note 12 at ¶ 18, at 834–35, citing *Int'l Shoe Co. v. Washington.*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

19. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

20. *Burger King, supra* note 17 at 475, 105 S.Ct. at 2183 (internal quotation marks omitted).

21. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984).

ered in the context of the fair and orderly administration of the laws.[22]

¶ 12 A court's jurisdiction to render a binding personal judgment historically required the person's physical presence within the territorial jurisdiction of the court.[23] While state lines remain relevant for jurisdictional purposes, the Supreme Court has gradually relaxed the limits placed on state jurisdiction by the Due Process Clause. It has done so explicitly in recognition of the increasingly interstate character of commerce and technological innovations in transportation and communication that make defense of a suit in a foreign jurisdiction less burdensome.[24]

 ¶ 13 Illustrative of this relaxation is the stream-of-commerce theory of personal jurisdiction, first pronounced by the Supreme Court's dictum in *World–Wide Volkswagen Corp. v. Woodson*.[25] Under the stream-of-commerce analysis, a state does not violate the precepts of due process if it asserts personal jurisdiction over a corporation that engages in conduct outside the forum that results in goods moving in the stream of commerce into the forum.[26] As the Court in *Woodson* explained,

> "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."[27]

¶ 14 *Woodson* did not present facts calling for the application of the stream-of-commerce analysis and when the Court next addressed the requirements of the theory in *Asahi Metal Industry Co., Ltd. v. Superior Court of California*,[28] it was unable to agree on precisely what conduct by a defendant would suffice to support a forum's exercise of personal jurisdiction under the stream-of-commerce analysis. Justice O'Connor and three other justices, delivering the judgment of the Court, opined that "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State."[29] A plaintiff must show additional conduct by the defendant directed toward the forum to support the exercise of jurisdiction consistent with the Due Process Clause.[30]

¶ 15 Four other justices in a separate writing authored by Justice Brennan saw no need to require additional conduct from a defendant once that defendant intentionally placed a product into the stream of commerce because the metaphorical notion that there is a stream in which commerce flows embodies the idea of purposefulness. "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale."[31] A participant in this process who is aware that the product with which he or she is connected will be marketed in the forum state cannot claim surprise when summoned to court in that forum or claim that he or she is being subjected to a burden in the forum without a corresponding benefit.[32]

¶ 16 Still another writing in *Asahi*, authored by Justice Stevens, declared that, al-

---

**22.** *Int'l Shoe, supra* note 18 at 319, 66 S.Ct. at 160.

**23.** *Pennoyer v. Neff*, 95 U.S. 714, 733, 24 L.Ed. 565 (1877).

**24.** *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293, 100 S.Ct. 559, 565, 62 L.Ed.2d 490 (1980), *quoting McGee v. International Life Ins. Co.*, 355 U.S. 220, 222–23, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

**25.** *See supra* note 24.

**26.** *Id.* at 297–98, 100 S.Ct. at 567.

**27.** *Id.*

**28.** 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

**29.** *Id.* at 112, 107 S.Ct. at 1032. Joining Justice O'Connor in the portion of the opinion dealing with minimum contacts were Chief Justice Rehnquist and Justices Powell and Scalia.

**30.** *Id.*

**31.** *Id.* at 117, 107 S.Ct. at 1034 (Brennan, J., concurring in part and concurring in judgment, joined by White, Marshall and Blackmun, JJ.).

**32.** *Id.*

though it was unnecessary to reach the question of minimum contacts, it was their considered opinion that a regular course of dealing that results in deliveries of a large quantity of a product annually over a period of several years would satisfy the "purposeful availment" requirement.[33] Because Justice Stevens could discern "no unwavering line ... between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market," he advocated that the volume, the value, and the inherent dangerousness of the product be taken into account in determining whether a defendant's conduct amounted to purposeful availment of the forum.[34]

¶ 17 The *Asahi* decision has created significant confusion in lower courts over the constitutional standard for minimum contacts under the stream-of-commerce theory.[35] Most courts that have addressed this problem have approached it as a choice between Justice O'Connor's "stream-of-commerce plus" version of the analysis and Justice Brennan's less rigorous standard. Generally overlooked is the fact that between the Brennan-and Stevens-authored writings, five justices in *Asahi* rejected Justice O'Connor's view. We have not heretofore chosen between these conflicting versions of the stream-of-commerce theory and we need not wade into that swamp today because Native Wholesale Supply has engaged in conduct that satisfies even the rigorous criterion advocated by Justice O'Connor. If the Company's conduct meets that test, then by definition it must exceed the conduct required by the other five justices in *Asahi* to satisfy due process.

¶ 18 In assessing Native Wholesale Supply's conduct under the O'Connor approach in *Asahi*, it is important to keep in mind that the underlying claim in *Asahi* was the liability of Asahi Metal, a Japanese manufacturer, for personal injuries allegedly caused by a defective motorcycle tire manufactured by a Taiwanese corporation using a part supplied by Asahi Metal. Asahi Metal had no contacts, directly or indirectly, with anyone in the forum state, it did not sell the component part in the United States apart from the finished product manufactured by another party, and it played no part in the distribution or sale of the finished product in the forum state. On these facts, Justice O'Connor indicated that there was nothing to tie Asahi Metal to the forum state beyond the mere happenstance that the stream of commerce had swept the finished product into the forum state in response to the actions of an independent third party. Justice O'Connor suggested that Asahi Metal might have had sufficient contacts with the forum state if it had created, controlled, or even just employed the distribution system that brought the product into the forum state.[36] It did not do even this, leaving Justice O'Connor to conclude that it had not purposefully availed itself of the market in the forum state.[37]

¶ 19 Native Wholesale Supply imports Seneca brand cigarettes from Grand River Enterprises Six Nations, LTD, a tribally-owned, Canadian-chartered tobacco product manufacturer that conducts operations in Canada. The imported cigarettes are stored in several locations in the United States, including the Free Trade Zone in Las Vegas, Nevada. Native Wholesale Supply then sells the cigarettes to tribal entities in the United

**33.** *Id.* at 122, 107 S.Ct. at 1037 (Stevens, J., joined by Justices White and Blackmun, concurring in part and concurring in judgment).

**34.** *Id.*

**35.** *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics*, 395 F.3d 1315, 1322 (C.A.Fed. 2005) (recognizing that the circuit courts of appeal have not agreed on the proper due process standard under the stream-of-commerce analysis; *comparing Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, 479–80, (6th Cir.2003)) (adopting Justice O'Connor's "stream-of-commerce 'plus' " theory) *with Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992) (applying Justice Brennan's approach because a majority of the Court has never rejected it) and *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 614 (8th Cir.1994) (same).

**36.** *Id.*

**37.** *Id.*

States. One such tribal entity is Muscogee Creek Nation Wholesale in Oklahoma.[38]

¶ 20 According to the president and sole shareholder of Native Wholesale Supply, a sales transaction between it and Muscogee Creek Nation Wholesale begins when the latter places an order with Native Wholesale Supply. Native Wholesale Supply then releases the cigarettes from storage and participates in arranging for their shipment by truck to the business location of Muscogee Creek Nation Wholesale, who then resells the cigarettes to tribal retailers. The Attorney General does not dispute that some of these retailers are located on tribal land of the Muscogee Creek Nation, but he has alleged that large quantities of Seneca cigarettes have been found for sale at smoke shops located off the tribal land. In any event, the retailers sell Seneca cigarettes to the general public in Oklahoma.

¶ 21 The State alleges that over a fifteen-month period *more than one hundred million cigarettes worth more than eight million dollars* were sold into the Oklahoma market through this process. The evidentiary material tendered by the Attorney General supports this allegation, at least up to several million cigarettes, and Native Wholesale Supply does not dispute that it markets a high volume of Seneca cigarettes to Muscogee Creek Nation Wholesale as part of an ongoing business relationship between the two entities. The expected demand for cigarettes by members of the Muscogee Creek Nation, according to national statistics provided by the Attorney General in the petition, is a small fraction of the number of cigarettes sold by Native Wholesale Supply to Muscogee Creek Nation Wholesale. Native Wholesale Supply does not dispute the veracity of these statistics.

¶ 22 Native Wholesale Supply claims it is not directing these millions of cigarettes at the Oklahoma market at all. It argues that it intends for all the cigarettes it sells to the tribal wholesaler to be sold only to reserva-

tion Indians and that it demonstrates this intent by placing a stamp on each package of Seneca cigarettes that says "for reservation sales only." If cigarettes happen to be sold by the tribal wholesaler to off-reservation retailers or if cigarettes are made available by tribal retailers to the general public in Oklahoma, those acts are not attributable to Native Wholesale Supply as acts by it purposefully directed at the Oklahoma cigarette market.

¶ 23 Whereas Justice O'Connor in *Asahi* was evaluating the contacts of a component parts manufacturer whose only relevant relationship was with another manufacturer in Taiwan, we are looking here at a distributor of a finished product—cigarettes—who causes the product to be delivered to an entity in this state in such quantities that its ultimate destination can only be the general public in this state. While the entity with which Native Wholesale Supply directly deals may operate on tribal land, that tribal land is not located in some parallel universe. It is geographically within the State of Oklahoma. Both entities are engaged in an enterprise whose purpose is to serve the Oklahoma market for cigarettes.

¶ 24 This is not a case where the defendant is merely aware that its product might be swept into this State and sold to Oklahoma consumers. The sheer volume of cigarettes sold by Native Wholesale Supply to wholesalers in this State shows the Company to be part of a distribution channel for Seneca cigarettes that intentionally brings that product into the Oklahoma marketplace. Native Wholesale Supply is not a passive bystander in this process. It reaps a hefty financial reward for delivering its products into the stream of commerce that brings it into Oklahoma. To claim, as Native Wholesale Supply does, that it does not know, expect, or intend that the cigarettes it sells to Muscogee Creek Nation Wholesale are intended for distribution and resale in Oklahoma is simply disingenuous.

**38.** Because no evidentiary material was tendered showing the tribal identity of Muscogee Creek Nation Wholesale or the location of its business operation, we are left to infer those facts from the tribal wholesaler's use of the Muscogee Creek Nation in its name and from the affidavit of Native Wholesale Supply's president in which he says that Native Wholesale Supply does business solely with tribal entities on tribal land.

¶ 25 In short, Native Wholesale Supply does not "merely set its products adrift on a stormy sea of commerce which randomly [sweeps] the products into" Oklahoma.[39] They arrive here by the purposeful collective acts of the Company and the tribal wholesalers with whom it does business. We hence hold that the minimum contacts segment of due process analysis is satisfied.

¶ 26 The presence of minimum contacts does not end the due process inquiry. "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"[40] In determining whether the exercise of jurisdiction comports with "fair play and substantial justice," we must evaluate the following factors: (1) the burden on the defendant of mounting a defense in the forum State, (2) the interests of the forum State, (3) the plaintiff's interest in obtaining relief, and (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several States in furthering fundamental substantive social policies.[41] *Considering Native Wholesale Supply's contacts with the State in light of these factors, we conclude that the exercise of personal jurisdiction in Oklahoma satisfies due process.*

¶ 27 First, the interest of the State in adjudicating this matter in Oklahoma is obviously very strong. The integrity of the Master Settlement Agreement depends on the ability of the State to enforce its terms. A decision adverse to the state on this issue would permit cigarette manufacturers and wholesalers to evade the MSA by setting up distribution networks whose participants pose as fully independent entities engaging in carefully structured transactions that ostensibly take place outside of the State. In this way, tobacco manufacturers and merchants could purposefully, albeit indirectly, target cigarettes at Oklahoma, reaping the economic benefit of engaging in the tobacco industry while evading the public policy embodied in the MSA and the Complementary Act of shifting the burden of tobacco-related health care costs from the State to the entities who profit from the smoking enterprise.

¶ 28 Second, defending this suit in Oklahoma does not present an undue burden on Native Wholesale Supply. Any burden upon Native Wholesale Supply from mounting a defense in Oklahoma is clearly minimal in light of the State's uncontroverted allegation that the Company reaps millions of dollars from the sale of Seneca cigarettes to Oklahoma consumers.

¶ 29 Finally, the states have a collective interest in the efficient resolution of controversies and in furthering fundamental substantive social policies. The courts of this State and only the courts of this State offer the most efficient and rational forum for the resolution of a controversy over the meaning and effect of State statutes governing the allocation of the financial and health-care costs associated with smoking between the public and private sectors.

## IV

## THE INDIAN COMMERCE CLAUSE DOES NOT BAR ENFORCEMENT OF THE COMPLEMENTARY ACT AGAINST NATIVE WHOLESALE SUPPLY

¶ 30 Native Wholesale Supply is a corporation chartered by the Sac and Fox Nation. Its president and sole shareholder is a person of Native–American ancestry. The trial court ruled that the Indian Commerce Clause bars the relief sought by the State against this company. That decision could rest on the doctrine of tribal immunity from suit or, alternatively, it could rest on the Indian Commerce Clause as a bar to the application

---

**39.** *Dehmlow v. Austin Fireworks,* 963 F.2d 941, 948 (7th Cir.1992).

**40.** *Burger King Corp. v. Rudzewicz, supra* note 17 at 476, 105 S.Ct. at 2174, *citing Int'l Shoe, supra* note 18 at 320, 66 S.Ct. at 160.

**41.** *Asahi, supra* note 28 at 113, 107 S.Ct. at 1033.

of the state's substantive law to Native Wholesale Supply. The former goes to whether the state has a remedy against Native Wholesale Supply for violation of the Complementary Act; the latter goes to whether the state has a right to enforce Native Wholesale Supply's compliance with state law.[42]

¶ 31 Suits against Indian *tribes* are barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.[43] This immunity from suit extends to *a tribe's commercial as well as to its governmental activities*[44] and protects the tribe or tribal entity regardless of whether its activities take place on or off a reservation.[45] Despite the breadth of this immunity, several courts have held that it does not automatically extend to every business that happens to be tribally chartered or owned by individuals of Native–American ancestry. It has thus been held that an enterprise is clothed with a tribe's sovereign immunity from suit only if it operates as an extension of a tribe.[46] The question is "whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe." [47] In assessing the relationship of an enterprise to a tribe, incorporation under tribal law is one factor to be considered, but it is not the only factor. Also important are whether the business is managed by tribal officials, whether it is operated to further tribal governmental objectives, and whether the business's property is owned by the tribe.[48]

¶ 32 We find persuasive the reasoning of those authorities that would restrict tribal immunity from suit to tribal entities that operate as an arm of the tribe. Individual Native Americans acting for their own purposes are no more entitled to the immunity from suit afforded a tribe than a private state citizen engaging in his or her own business is entitled to the State's sovereign immunity. Tribal freedom from suit is an attribute of Indian sovereignty and may not and should not be extended to cover private entities operating for private gain based solely on the ethnicity of their owners.

¶ 33 Having so decided, we hold that Native Wholesale Supply is not clothed with tribal immunity from suit. Although Native Wholesale Supply is chartered by the Sac

42. *See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) in which the United States Supreme Court held that the defendant tribe was not immune from the obligation to collect taxes on sales of cigarettes to nonmembers, but enjoyed immunity from suit by the state to enforce the obligation.

43. *Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998); *Citizen Band Potawatomi Indian Tribe of Okla.*, supra note 42 at 509, 111 S.Ct. at 909; *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978).

44. *Kiowa Tribe*, supra note 43 at 760, 118 S.Ct. at 1705; *Native American Distributing v. Seneca–Cayuga Tobacco Co.*, 546 F.3d 1288, 1293 (10th Cir.2008) (holding that sovereign immunity extended to a corporate enterprise of the tribe).

45. *Kiowa Tribe*, supra note 43 at 760, 118 S.Ct. at 1705.

46. *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir.2006) ("When the tribe establishes an entity to conduct certain activities, the entity is immune if it functions as an arm of the tribe."), *cert. denied*, 549 U.S. 1231, 127 S.Ct.
1307, 167 L.Ed.2d 119 (2007); *Hagen v. Sisseton–Wahpeton Cmty. College*, 205 F.3d 1040, 1043 (8th Cir.2000); *Ramey Constr. Co., Inc., v. Apache Tribe of the Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir.1982) (holding that an inn which was "a sub-entity of the Tribe rather than a separate corporate entity" enjoyed tribal immunity); *Trudgeon v. Fantasy Springs Casino*, 71 Cal.App.4th 632, 642, 84 Cal.Rptr.2d 65 (1999) (recognizing sovereign immunity of for-profit corporation formed by a tribe to operate the tribe's casino); *City of New York v. Golden Feather Smoke Shop, Inc.*, 2009 WL 705815 (E.D.N.Y.2009); *Parks v. Tulalip Resort Casino*, 2010 WL 1727972 (W.D.Wash.2010); *Somerlott v. Cherokee Nation Distributors Inc.*, 2010 WL 1541574, *3 (W.D.Okla.2010) (reviewing the authorities supporting the "arm of the tribe" inquiry and adopting it after finding broad support for its method of analysis). *See also F. Cohen, Handbook of Federal Indian Law*, § 7.05(1)(a), at 636 (2005 ed.) stating, "Although immunity extends to entities that are arms of the tribes, it apparently does not cover tribally chartered corporations that are completely independent of the tribe.".

47. *Allen*, supra note 46 at 1046.

48. *See e.g., Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F.Supp.2d 442, 477 (E.D.N.Y.2009).

and Fox Nation, it does business on the tribal land of a different tribe; it is not managed by tribal officials of either tribe; and it is not operated to further the governmental objectives of any tribe. It operates solely as a private business for the personal profit of its owner who happens to be a Native American belonging to the Seneca Nation. The Company simply does not have a sufficiently close affiliation with any tribe to share in that tribe's sovereign immunity from suit.

¶ 34 Just because Native Wholesale Supply is not entitled to tribal immunity from suit does not automatically mean that it is subject to the State's substantive law. Indian sovereignty rights are broader than just immunity from suit. In suits where Native–American tribes and individuals have initiated the litigation, thereby removing from consideration the question of tribal immunity from suit, a body of law has developed governing the conditions under which the principle of Indian Sovereignty bars the application of substantive state law to tribes and individual Indians.

¶ 35 The Indian Commerce Clause invests in Congress the power to "regulate Commerce ... with the Indian tribes." [49] From these few words has emerged almost two centuries of United States Supreme Court jurisprudence aimed at reaching an acceptable accommodation between the claim of Native Americans to tribal sovereignty on their own land and the competing claim of the states that they have a right to assert their authority over all persons living within their borders. Not surprisingly, the contours of this accommodation have fluctuated over time in ways that reflect the changing relationship between Native Americans and the broader American society.

¶ 36 In the early nineteenth century, the notion of Indian communities as semi-independent nations led the Court to deny to the states the right to play any role within a reservation's boundaries.[50] That bright line of separation has long since disappeared.[51] In *White Mountain Apache Tribe v. Bracker*,[52] the United States Supreme Court noted that there is no longer a rigid rule "by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." [53] In *Bracker*, the Court synthesized various strands of its Indian law jurisprudence into a two-part test to determine which state laws may be enforced in Indian country without congressional consent.[54] This two-part test consists of two independent but related barriers to the assertion of state authority on Indian land: (a) preemption by federal law and (b) impermissible infringement on the right of reservation Indians to make their own laws and be ruled by them.[55]

¶ 37 While either barrier standing alone may be "a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members," [56] the two barriers are related in important ways. The tradition of tribal self-government requires the application to federal enactments regulating Indian tribes standards of preemption different from those used in other areas of law.[57] "The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exer-

---

**49.** U.S. Const. art. 1, § 8.

**50.** *Worcester v. Georgia*, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832).

**51.** *Williams v. Lee*, 358 U.S. 217, 219, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959)("Over the years this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, ...").

**52.** *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

**53.** *Id.* at 142, 100 S.Ct. at 2583.

**54.** *Id.* (stating that the semi-independent status accorded Indian tribes together with the broad power of Congress to regulate tribal affairs under the Indian Commerce Clause has produced "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members").

**55.** *Id.*

**56.** *Id.* at 143, 100 S.Ct. at 2583.

**57.** *Id.*

cise of state authority has been pre-empted by operation of federal law."[58] That tradition "is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development."[59] Preemption may therefore be found even in the absence of an express congressional statement of preemptive intent[60] and ambiguities in federal enactments must be construed in light of traditional notions of sovereignty and the federal policy of encouraging tribal independence.[61] At the same time, the applicable regulatory interest of the State must be taken into account to see if it outweighs the federal and tribal interests at stake.[62] In short, *Bracker* established a test that balances the federal, tribal, and state interests in determining when a state may exercise authority on tribal land.

■ ¶ 38 The conflict between Indian sovereignty and state authority has most often been played out in the area of state taxation of tribes and tribal members. Applying the foregoing principles to *state taxa-*

*tion* of on-reservation conduct involving only Indians, the Court has held that, absent congressional consent, there is a "categorical bar" to state tax levies whose legal incidence falls directly upon tribes or tribal members for conduct that takes place wholly on tribal land.[63]

> "[I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and ... such taxation is not permissible."[64]

This is so, the Court has explained, because the federal interest in encouraging tribal self-government in such cases is at its strongest and any state interest is correspondingly weak.[65]

■■ ¶ 39 Where *the legal incidence of a tax falls on a non-tribal entity* engaged in a transaction with a tribe or tribal members on the reservation, no categorical bar operates to bar the tax,[66] but the Court has urged

---

**58.** *Id.*

**59.** *Id.* at 143, 100 S.Ct. at 2583–84.

**60.** *Id.* at 144, 100 S.Ct. at 2584.

**61.** *Id.* at 143–44, 100 S.Ct. at 2584.

**62.** *Id.* at 144, 100 S.Ct. at 2584.

**63.** *See, e.g., McClanahan v. State Tax Comm'n of Arizona,* 411 U.S. 164, 165–66, 93 S.Ct. 1257, 1258–59, 36 L.Ed.2d 129 (1973) (tax on income earned on reservation by tribal members residing on reservation invalid); *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 480, 96 S.Ct. 1634, 1645, 48 L.Ed.2d 96 (1976) (holding invalid (in the absence of congressional consent) property tax on personal property located within the reservation, vendor license fee as applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land, and cigarette sales tax as applied to on-reservation sales by Indians to Indian members of the governing tribe, but valid as to non-Indian purchasers); *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (tax on Indian-owned personal property situated in Indian country invalid in absence of congressional consent); *Okla. Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (where legal incidence of motor fuel excise tax fell on Indian-owned retail-

ers selling fuel on tribal trust land the tax was invalid in the absence of congressional consent).

**64.** *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216, n. 17, 107 S.Ct. 1083, 1092, n. 17, 94 L.Ed.2d 244 (1987).

**65.** *Id.* ("We have repeatedly addressed the issue of state taxation of tribes and tribal members and the state, federal, and tribal interests which it implicates. We have recognized that the federal tradition of Indian immunity from state taxation is very strong and that the state interest in taxation is correspondingly weak. Accordingly, it is unnecessary to rebalance these interests in every case."). Despite such statements in earlier cases, the Court has recently said that in the special area of state taxation of tribes and tribal members on tribal land, it has not applied the balancing test at all. *See Wagnon v. Prairie Band Potawatomi Nation,* 546 U.S. 95, 110, 126 S.Ct. 676, 686, 163 L.Ed.2d 429 (2005) ("We have applied the balancing test articulated in *Bracker* only where 'the legal incidence of the tax fell on a nontribal entity engaged in a transaction with tribes or tribal members' [citation omitted] on the reservation.").

**66.** Decisions holding a tax on a non-Indian to be preempted: *Warren Trading Post Co. v. Arizona State Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (Indian Trader Statutes

caution in inferring congressional permission to impose such a tax from the absence of an express Congressional statement of preemptive intent.[67] In this area of taxation, the *Bracker* interest balancing test requires a court to engage in "a particularized inquiry into the nature of the state, federal, and tribal interests at stake ... to determine whether ... the exercise of state authority would violate federal law."[68] Applying the *Bracker* test, the Court has not only held it permissible to impose a state sales tax upon the on-reservation sales of goods by Indians to non-Indians,[69] but has also held that sales by members of a reservations's governing tribe to members of another tribe are amenable to state taxation.[70] This is so because

when state interests outside the reservation are implicated, states may regulate the activities even of tribe members on tribal land.[71]

¶ 40 Also valid under the *Bracker* balancing test are regulations imposed on tribal wholesalers and retailers that are reasonably necessary to assess and collect a valid tax imposed on others. Thus, a tribal retailer can be required to pre-collect a valid state tax imposed on non-tribal members for sales made on the reservation,[72] and may also be required to keep records of exempt and non-exempt sales reasonably necessary to prevent fraudulent transactions.[73] Similarly, to assist in the collection of a sales tax validly

preempted state tax on the gross receipts of a non-Indian federally licensed retailer who operated a store on an Indian reservation); *Central Machinery Co. v. Arizona State Tax Comm'n,* 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980) (Indian Trader Statutes preempt the field of retail transactions with Indians on Indian reservations so that non-federally licensed retailer residing off-reservation but conducting business with Indians on their reservation is immune from state's transaction privilege tax on on-reservation sale of tractor to tribal enterprise); *Bracker, supra* note 52 at 148–49, 100 S.Ct. at 2586–87 (holding that motor carrier license and fuel taxes imposed on a non-Indian-owned logging company's use of federally built, maintained, and policed roads located solely within an Indian reservation was invalid because Congress had enacted a comprehensive federal law regulating the harvesting of Indian timber and the State had not been able to identify any legitimate regulatory interest served by the taxes sought to be imposed).; *Ramah Navajo School Bd. v. Bureau of Revenue,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982) (a comprehensive federal regulatory scheme for the education of reservation Indian children preempted a state tax on the gross receipts of a non-Indian contractor who constructed a school building for Indian children on their reservation). *Decisions holding state tax on non-Indian to be valid: Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) (Mineral Leasing Act of 1938 did not preempt a state severance tax on non-Indian oil and gas producer whose operations were located on an Indian reservation and tax was valid where it imposed no economic burden on the tribe); *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation, supra* note 63 at 481–82, 96 S.Ct. at 1645 (state may impose non-discriminatory sales tax on non-Indian customers of Indian retailers doing business on the reservation even if the tax seriously disadvantages the Indian retailer's business with non-Indians); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 161,

100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980) (state may impose a nondiscriminatory tax upon on-reservation sales to Indians who are not members of the reservation's governing tribe "for the simple reason that nonmembers are not constituents of the governing tribe" with a say in tribal affairs or a significant share in tribal disbursements).

67. *Bracker, supra* note 52 at 150–51, 100 S.Ct. at 2587.

68. *Bracker, supra* note 52 at 145, 100 S.Ct. at 2584.

69. *Moe, supra* note 63 at 481–82, 96 S.Ct. at 1645 (state may impose non-discriminatory sales tax on non-Indian customers of Indian retailers doing business on the reservation even if the tax seriously disadvantages the Indian retailer's business with non-Indians).

70. *Colville, supra* note 66 at 161, 100 S.Ct. at 2085 (state may impose a nondiscriminatory tax upon on-reservation sales to Indians who are not members of the reservation's governing tribe "for the simple reason that nonmembers are not constituents of the governing tribe" with a say in tribal affairs or a significant share in tribal disbursements).

71. *Nevada v. Hicks,* 533 U.S. 353, 362, 121 S.Ct. 2304, 2311, 150 L.Ed.2d 398 (2001).

72. *Moe, supra* note 63 at 483, 96 S.Ct. at 1646 ("State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax.").

73. *Confederated Tribes of the Colville Indian Reservation, supra* note 66 at 160, 100 S.Ct. at 2084.

imposed on sales to non-tribal members, a non-Indian wholesaler of cigarettes can be required to keep detailed records and comply with quantity limitations on the number of cigarettes it sells to a tribal retailer.[74] And a state may seize a product en route to a reservation when the tribe refuses to fulfill its validly-imposed collection and remittance obligation.[75]

 ¶ 41 The *Bracker* interest balancing test is also brought to bear when a state seeks to apply a non-discriminatory, non-tax-related state law to an on-reservation activity. "Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border." [76] If the state's assertion of authority touches upon an on-reservation activity that is recognized by the federal government as a means for the tribe to achieve self-sufficiency and economic development [77] or if there is a historical tradition of Indian control of the activity,[78] the activity will be held to be preempted from state regulation unless the State is able to offer a justification for asserting its authority that outweighs the asserted federal or tribal interests.[79] Accordingly, the Court has held that a tribal liquor retailer could be required to obtain a state liquor license for the sale of alcohol for off-premises consumption because there was no historical tradition of tribal control of alcohol licensing and distribution and the state had a strong interest in regulating the activity.[80] But because there was a clear federal policy of promoting tribal gaming as a means of Indian economic development, the state of California could not regulate tribally-operated bingo games.[81]

 ¶ 42 Finally, unless expressly prohibited by federal law, activities conducted by Native Americans off the reservation or the off-reservation activities of non-Indians or nonmember Indians doing business with reservation Indians are generally held to be subject to non-discriminatory state laws.[82] Resort to the *Bracker* interest bal-

74. *Dept. of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994) (Indian Trader Statutes did not preempt regulations imposed on federally licensed wholesalers who were required to keep detailed records and comply with limitations on the quantity of cigarettes they could sell to on-reservation retailers where the regulations were reasonably necessary to enforce the assessment and collection of a valid state tax imposed on non-Indian and nonmember Indian purchasers of cigarettes from reservation retailers).

75. *Confederated Tribes of the Colville Indian Reservation, supra* note 66 at 161–62, 100 S.Ct. at 2085.

76. *Nevada v. Hicks, supra* note 71 at 361, 121 S.Ct. at 2311 (holding that "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations" while the "State's interest in execution of process is considerable, and even when it relates to Indian-fee lands it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government"). *Id.* at 364, 121 S.Ct. at 2313.

77. *Cabazon Band of Mission Indians, supra* note 65 at 216, 107 S.Ct. at 1092 ("The inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.").

78. *Rice v. Rehner*, 463 U.S. 713, 719–20, 103 S.Ct. 3291, 3296, 77 L.Ed.2d 961 (1983) ("When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect.... If, however, we do not find such a tradition, or if we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the "backdrop" of tribal sovereignty.").

79. *Cabazon Band of Mission Indians, supra* note 65 at 216, 107 S.Ct. at 1092, *quoting New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983) ("State jurisdiction is pre-empted ... if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.").

80. *Rice v. Rehner, supra* note 78 at 725, 103 S.Ct. at 3299.

81. *Cabazon Band of Mission Indians, supra* note 65 at 221–22, 107 S.Ct. at 1094–95.

82. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114

ancing test in such a case is unnecessary.[83] Thus, hunting and fishing rights exercised by members of two Alaska Indian communities who had no reservation or other designated tribal land were subject to state conservation laws because state authority under those circumstances "does not impinge on treaty-protected reservation self-government."[84] A state tax can be levied on off-reservation activity by a tribe such as operating a ski resort off the reservation.[85] A state may also tax income earned by a tribal member employed by the tribe on the reservation if the tribal member resides off the reservation, provided that no federal law or treaty prohibits it.[86] And a state motor fuel tax can be imposed on non-Indian distributors who sell fuel to on-reservation tribal fuel retailers where the tax is imposed on the distributors for receipt of the fuel off the reservation.[87]

■ ¶ 43 Native Wholesale Supply argues that transactions between Native Americans—"tribal to tribal transactions"—are beyond the reach of state regulatory power.[88] While Native Wholesale Supply does not say so expressly, it seems to be arguing that there is a dormant or negative aspect to the Indian Commerce Clause analogous to that found in the Interstate Commerce Clause. By granting to Congress the power to regulate Indian commerce, the Company implies, the Indian Commerce Clause forbids states to regulate such commerce. We see no support for such an interpretation of the Indian Commerce Clause in the jurisprudence of the United States Supreme Court, whose decisions clearly establish that the Indian Commerce Clause does not "of its own force" automatically bar all state regulation of Indian commerce.[89] Rather, each state assertion of authority over tribal land and tribal members must be examined in light of the Indian sovereignty principles developed by the Supreme Court for conformity to federal law.

■ ¶ 44 Even accepting for the sake of argument that Native Wholesale Supply's transactions with Muscogee Creek Nation Wholesale take place on the Seneca Cattaraugus Indian Territory in New York because the business is located and accepts orders there, the Company's argument that enforcement of the Complementary Act against it violates the Indian Commerce Clause is clearly wrong. There is no blanket

(1973) ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."); *Bracker, supra* note 52 at 144, n. 11, 100 S.Ct. at 2584, n. 11.

83. *Wagnon v. Prairie Band Potawatomi Nation, supra* note 65 at 112–13, 126 S.Ct. at 688, (rejecting the tribe's argument that an off-reservation tax imposed on the manufacture or sale of goods imported by the tribe or one of its members must be subjected to the interest balancing test).

84. *Organized Village of Kake v. Egan,* 369 U.S. 60, 75–76, 82 S.Ct. 562, 571, 7 L.Ed.2d 573 (1962); *Puyallup Tribe v. Dept. of Game,* 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968).

85. *Mescalero Apache Tribe v. Jones, supra* note 82 at 157–58, 93 S.Ct. at 1275.

86. *Okla. Tax Comm'n v. Chickasaw Nation, supra* note 63 at 465, 115 S.Ct. at 2224 (rejecting Treaty of Dancing Rabbit Creek as preempting the tax). The Court declined to consider whether the tax might constitute an interference with tribal self-governance because the tribe failed to raise the issue either below or on certiorari. *Id.* at 465, n. 14, 115 S.Ct. at 2223, n. 14.

87. *Wagnon, supra* note 65 at 115, 126 S.Ct. at 689.

88. Native Wholesale Supply characterizes its reliance on the Indian Commerce Clause as a challenge to the state court's subject matter jurisdiction. Because the inquiry under the Indian Commerce Clause is based on a type of federal preemption, that characterization may be inaccurate. Federal preemption is ordinarily an affirmative defense that may result in a lawsuit's dismissal for failure to state a claim. That decision is within the subject matter jurisdiction of a state court. *See e.g., BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 855 (11th Cir.1999) ("... ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court."). *See also, Reeds v. Walker,* 2006 OK 43, ¶ 14, 157 P.3d 100, 109 (distinguishing between the complete preemption doctrine of federal jurisdiction and the affirmative defense of ordinary preemption).

89. *See e.g. Confederated Tribes of the Colville Indian Reservation, supra* note 66 at 154–62, 100 S.Ct. at 2069; *Milhelm Attea & Bros., Inc., supra* note 74 at 75, 114 S.Ct. at 2028; *Ward v. New York,* 291 F.Supp.2d 188, 199–200 (W.D.N.Y. 2003).

ban on state regulation of inter-tribal commerce even on a reservation. The Supreme Court has ruled precisely on that point by allowing state taxation of retail sales made on-reservation by tribal retailers to Native Americans who are not members of the governing tribe.[90] The transactions at issue in this case are between a Sac and Fox chartered corporation operating on the tribal land of another tribe with a third tribe, the Muscogee Creek Nation. Such transactions are not beyond the reach of state authority.

¶ 45 In reality, Native Wholesale Supply's transactions with Muscogee Creek Nation Wholesale extend beyond the boundaries of any single "reservation." The cigarettes at issue are manufactured in Canada, shipped into the United States, and stored in a Free Trade Zone in Nevada. Muscogee Creek Nation Wholesale places orders for cigarettes from its "reservation" located within the territorial boundaries of this State to Native Wholesale Supply at the latter's principal place of business on another "reservation" in another State. Delivery of the cigarettes to Muscogee Creek Nation Wholesale requires shipment of the cigarettes from Nevada to the purchaser's tribal land in Oklahoma. The entire process comprising these sales thus takes place in multiple locations both on and off different tribal lands. This is not on-reservation conduct for purposes of Indian Commerce Clause jurisprudence, but rather off-reservation conduct by members of different tribes. Therefore, Oklahoma's enforcement of the Complementary Act against Native Wholesale Supply passes muster without even evaluating it under the *Bracker* interest balancing test. "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." [91] The Complementary Act is a law of general application and there is no evidence that it is applied to Native–American cigarette wholesalers in a discriminatory manner.

¶ 46 Even if we were required to apply the *Bracker* interest balancing test for on-reservation activity by tribal members, the State's interest in enforcing the MSA through the Complementary Act would outweigh any interest the tribe or federal government might have in prohibiting its enforcement against Native Wholesale Supply. Neither the underlying MSA-imposed escrow obligation of the tobacco manufacturer nor the equitable relief sought against Native Wholesale Supply is a tax. The latter is a method adopted by the State to regulate the distribution and sale of tobacco products in the Oklahoma market. Native Wholesale Supply *has failed to cite any federal enactment* that expressly prevents the State of Oklahoma from regulating tobacco product distribution and sales in Oklahoma for the protection of the public treasury, defense of public health, and in the interest of maintaining the integrity of the Master Settlement Agreement.

¶ 47 Native Wholesale Supply relies instead on the general policy of the federal government to encourage economic development and self-sufficiency on the part of Indian tribes and tribal members [92] and urges that because the Complementary Act interferes with its ability to engage in commerce with Muscogee Creek Nation Wholesale, the Act is preempted by federal law. We disagree. There is no federal jurisprudence pronouncing Indian sovereignty in the area of cigarette distribution and sales, nor have we been directed to any congressional enactments reflecting and encouraging tribal self-sufficiency and economic development through the distribution and sale of cigarettes.

¶ 48 The State of Oklahoma, on the other hand, has an exceedingly strong interest in enforcing compliance with the terms of the MSA. These interests have been set out by the legislature in the MSA and the Complementary Act. They include (a) shifting the costs of medical care for Oklahomans with smoking-related health care issues from the state to those in the business of manufactur-

---

90. *Id.*

91. *See Mescalero Apache Tribe v. Jones, supra* note 82.

92. *See e.g. Cabazon Band of Mission Indians, supra* note 36 and *Rice v. Rehner, supra* note 78.

ing tobacco products and (b) preventing tobacco manufacturers who are not part of the MSA from gaining a cost advantage over their MSA-participating competitors.[93] The Complementary Act is a reasonably necessary, non-preempted means of carrying out these policies.

## V

### SUMMARY

¶ 49 Native Wholesale Supply, a tribally-chartered, Native–American owned corporation that distributes cigarettes to tribal entities in the United States seeks to avoid the strictures and incidence of state law regulating the distribution and sale of cigarettes. We hold that the State has personal jurisdiction over the defendant based on the Company's purposeful availment of the Oklahoma cigarette marketplace and has jurisdiction over the subject matter of this suit, the Native–American identity of the participants in the distribution channel notwithstanding.

¶ 50 **THE TRIAL COURT'S JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS TO BE CONSISTENT WITH THIS OPINION.**

¶ 51 EDMONDSON, C.J., TAYLOR, V.C.J., HARGRAVE, OPALA, WATT, WINCHESTER and COLBERT, JJ., concur.

¶ 52 KAUGER, J., concurs in the court's answer to the first question and concurs in result in the court's answer to the second question.

¶ 53 REIF, J., concurs in result.