2013 OK CIV APP 58

**STATE of Oklahoma ex rel. W.A. "Drew" EDMONDSON, Attorney General of Oklahoma, Plaintiff,**

v.

**GRAND RIVER ENTERPRISES SIX NATIONS, LTD., Defendant,**

and

**Grand River Enterprises Six Nations, Ltd., a Canadian corporation, and Tobaccoville, USA, Inc., a South Carolina corporation, Plaintiffs/Appellants,**

v.

**State of Oklahoma ex rel. Oklahoma Tax Commission and State of Oklahoma ex rel. Office of the Attorney General of Oklahoma, Defendants/Appellees.**

No. 109484.

Court of Civil Appeals of Oklahoma, Division No. 2.

March 27, 2013.

Certiorari Denied May 28, 2013.

Douglas B. Allen, General Counsel, Larry D. Patton, Senior Assistant General Counsel, Marjorie L. Welch, First Deputy Counsel, Oklahoma Tax Commission, Oklahoma City, Oklahoma, for Appellee Oklahoma Tax Commission.

E. Clyde Kirk, Ryan R. Chaffin, Assistant Attorney Generals, Tobacco Enforcement, Oklahoma City, Oklahoma, for Appellee Oklahoma Attorney General.

Robert N. Sheets, Marc Edwards, Phillips Murrah P.C., Oklahoma City, Oklahoma, for Appellants.

DEBORAH B. BARNES, Vice–Chief Judge.

¶ 1 This is the second appeal in this case. The first appeal was taken from the trial court's May 2009 order granting summary judgment in favor of the State of Oklahoma *ex rel.* Office of the Attorney General of Oklahoma (AG) and against Grand River Enterprises Six Nations, Ltd., a Canadian corporation (GRE). This Court dismissed that appeal for lack of an appealable order. Tobaccoville USA, Inc., a South Carolina corporation (Tobaccoville), and GRE now appeal the trial court's "Order Nunc Pro Tunc of Findings of Fact and Conclusions of Law," filed on April 20, 2011, denying "in their entirety" the claims of GRE and Tobaccoville and entering judgment in favor of AG and the State of Oklahoma *ex rel.* Oklahoma Tax Commission (OTC) (or, collectively, the State). Based on our review of the record on appeal and applicable law, we affirm.

## BACKGROUND

¶ 2 In 1998, Oklahoma, along with forty-five other states, entered into a Master Settlement Agreement (MSA) with the four largest American tobacco product manufacturers.[1] These first four tobacco manufacturer signatories to the MSA agreed to make annual payments to the settling states in perpetuity and, in exchange, the settling states agreed to release them from liability for claims to recover for tobacco-related

---

1. *State of Okla. ex rel. W.A. "Drew" Edmondson v. Native Wholesale Supply,* 2010 OK 58, ¶ 2, 237 P.3d 199, 203.

health costs.[2] Other tobacco manufacturers may elect to participate in the MSA at any time and be released from liability.

¶ 3 Manufacturers of tobacco products that continue to sell cigarettes in the United States without joining the MSA are known as "non-participating manufacturers" (NPMs). GRE is an NPM. Pursuant to the MSA, "each of the settling states also enacted legislation that required [NPMs] who sell cigarettes in a particular state ... to make annual payments to be held in an escrow fund for twenty-five years."[3] In 1999, the Oklahoma Legislature amended the Prevention of Youth Access to Tobacco Act (the Act), 37 O.S.2011 §§ 600.1–600.23, to address NPM escrow payments. The added sections, §§ 600.21–600.23, are commonly referred to as the "Escrow Statute."

¶ 4 Section 600.21 of the Escrow Statute provides in pertinent part as follows:

C. The Oklahoma Legislature ... finds that it is the policy of the State of Oklahoma that financial burdens imposed on the state by cigarette smoking should be borne by tobacco product manufacturers rather than by the State of Oklahoma to the extent that such manufacturers either determine to enter into a settlement with the state, or are found culpable by the court....

D. The Oklahoma Legislature ... finds that it would be contrary to the policy of the State of Oklahoma if tobacco product manufacturers who determine not to enter into [the MSA] could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them

if they are proven to have acted culpably; and that it is thus in the interest of the State of Oklahoma to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

Pursuant to the Escrow Statutes: NPMs are to make these escrow deposits based upon the number of cigarette "units sold" in Oklahoma each year; interest or appreciation on the funds reverts back to the appropriate NPM; and the escrow deposits that have not been used to pay a judgment or settlement "shall be released from escrow and revert back to such tobacco product manufacturer twenty-five (25) years after the date on which they were placed into escrow." § 600.23(B)(3).

¶ 5 "Soon after passage of [the Escrow Statute], it became clear ... that [NPMs] were evading their escrow obligation. Oklahoma ... responded to this noncompliance by enacting complementary enforcement legislation." *Native Wholesale Supply*, ¶ 4, 237 P.3d at 203. This legislation, 68 O.S. Supp. 2004 §§ 360.1–360.9 (amended in 2008 and 2010), known as the Master Settlement Agreement Complementary Act, provides in part that

all tobacco product manufacturers whose products are sold in Oklahoma [are] to provide the Attorney General's office with an annual certification that the manufacturer has either signed on to participate in the MSA or is fully compliant with the qualifying statute's escrow requirement.

**2.** *Id.; KT & G Corp. v. Attorney Gen. of State of Okla.*, 535 F.3d 1114, 1118 (10th Cir.2008). Title 37 O.S.2011 § 600.21(C) states in pertinent part as follows:
[O]n November 23, 1998, leading United States tobacco product manufacturers entered into a settlement agreement, entitled the "Master Settlement Agreement," with the state, which obligates these manufacturers, in return for a release of past, present and certain future claims against them as described therein, to pay substantial sums to the state (tied in part to their volume of sales); to fund a national foundation devoted to the interests of public health; and to make substantial changes in their advertising and market-

ing practices and corporate culture, with the intention of reducing underage smoking.

**3.** *KT & G Corp.*, 535 F.3d at 1118. *See also Native Wholesale Supply*, ¶ 3, 237 P.3d at 203 ("[T]o prevent [NPMs] from gaining a cost advantage ... and to provide the states with a source of money from which to recover tobacco-related health care costs," the MSA "calls for each settling state to enact and enforce a statute ... requiring all [NPMs] who sell cigarettes in a state to make annual payments into an escrow account based on the manufacturer's relative market share in such state.") (footnote omitted).

The Complementary Act requires the Attorney General's Office to publish on its website an annual list of all [NPMs] who have complied with the certification requirement and met their escrow obligation.

*Native Wholesale Supply,* ¶ 4, 237 P.3d at 203–204 (footnotes omitted).

## PROCEDURAL HISTORY

¶ 6 As stated in Case No. 107,168, the first appeal arose out of two consolidated lawsuits regarding a dispute, on the one hand, between OTC and AG as to the proper enforcement of the Escrow Statute and, on the other hand, between the State and GRE and Tobaccoville, regarding escrow payments for "units sold" in 2005 and 2006.

¶ 7 In August of 2006, AG sued GRE alleging it knowingly failed to comply with the Escrow Statute for the year 2005. Prior to answering, GRE and Tobaccoville filed a separate lawsuit against the State, seeking a declaratory judgment interpreting the Escrow Statute, an accounting, and injunctive relief regarding payments under the Escrow Statute.

¶ 8 In September of 2006, GRE answered the petition filed by AG, alleging it does not sell tobacco products within Oklahoma and urging that Tobaccoville be joined in the lawsuit as a party needed for just adjudication because it sells cigarettes manufactured by GRE. GRE also alleged the State miscounted the number of "units sold" by including cigarettes sold in prior years, cigarettes sold on tribal lands, and/or cigarettes illegally sold by unauthorized third parties.

¶ 9 The two lawsuits were consolidated in November of 2006. With leave of court, AG filed a "supplemental petition" on June 14, 2007, adding allegations of Escrow Statute violations occurring in 2006.

¶ 10 In June of 2008, AG filed a motion for partial summary adjudication against GRE only. The trial court granted, in part, AG's motion against GRE, finding, in pertinent part and pursuant to the Escrow Statute, that the number of "units sold" in a year is equal to the number of packs of cigarettes manufactured by an NPM to which "a tax stamp issued by the State of Oklahoma is actually affixed" during that year. The trial court also found "that packs of cigarettes manufactured by an [NPM] which have a tax stamp issued by the State of Oklahoma affixed thereto and are sold in the State of Oklahoma by retailers owned, licensed, or operated by an Indian Tribe are 'units sold' upon which escrow is due." The trial court granted partial summary adjudication in favor of AG on these issues, and stated, "A ruling on the issue of the number of 'units sold' by [GRE] during the years 2005 and 2006, and corresponding escrow obligations, is reserved until such time as an evidentiary hearing is held on same."

¶ 11 An evidentiary hearing was held in March of 2009. AG presented three witnesses (one by deposition), and GRE presented no evidence. In an order filed on May 5, 2009, the trial court incorporated the order granting partial summary adjudication, and further ordered GRE to pay an escrow deficiency of $3,397,243.83 for 2005, and $1,680,625.88 for 2006. The trial court also imposed a civil penalty of $507,786.97 pursuant to 37 O.S. Supp.2003 § 600.23(E)(1).

¶ 12 GRE appealed by filing a petition in error in June of 2009. However, because the May 5, 2009 order made no reference to or determination regarding OTC or Tobaccoville, GRE's appeal from the May 5, 2009 order was dismissed by this Court in Case No. 107,168 for lack of a final, appealable order. Mandate issued on February 10, 2011.

¶ 13 The State asserts in its Answer Brief that the "failure to reference" OTC and Tobaccoville in the May 5, 2009 order "was merely an inadvertent clerical error." [4] Accordingly, the parties filed a "Joint Motion of All Parties for Order 'Nunc Pro Tunc' Findings of Fact and Conclusions of Law" and, on April 20, 2011, the trial court's "Order Nunc Pro Tunc of Findings of Fact and Conclusions of Law" was filed. In its Order, the trial court set forth the same findings regarding "units sold" as set forth in its May 5, 2009 order. The April 2011 Order also states, in pertinent part, as follows:

4. Answer Brief, p. 10.

4. Licensed Oklahoma wholesalers submit reports to the [OTC] on a monthly basis called [NPM Reports]. The NPM Reports are signed and dated by the licensed Oklahoma wholesaler submitting same under penalty of perjury that the information contained therein is true and correct.

5. The NPM Reports submitted by licensed Oklahoma wholesalers show the number of "units sold" of NPM manufactured cigarettes, by brand and manufacturer, in the State of Oklahoma during a given month and year by the licensed wholesaler submitting the report.

. . . .

9. [GRE] is an [NPM] that sold cigarettes in the state of Oklahoma during calendar years 2005 and 2006.

10. Seventeen (17) different licensed Oklahoma wholesalers submitted NPM Reports indicating a total of at least 170,366,-380 "units sold" of GRE manufactured cigarettes in the State of Oklahoma during calendar year 2005.

11. One of the seventeen (17) licensed Oklahoma wholesalers . . . was a company known as Sycamore Ridge. . . . [It] submitted signed NPM Reports indicating 109,-338,660 "units sold" of GRE manufactured products in the State of Oklahoma during 2005.

12. Tobaccoville . . . is an importer of GRE manufactured cigarettes that is located outside the State of Oklahoma. Tobaccoville sold the GRE manufactured cigarettes to Sycamore Ridge that Sycamore Ridge eventually sold to retailers located in the State of Oklahoma.

13. Sycamore Ridge did not sell any of the GRE manufactured cigarettes it purchased from Tobaccoville to retailers located in the state until 2005.

14. Tobaccoville is not a licensed Oklahoma wholesaler and may not purchase or affix excise tax stamps of the State of Oklahoma.

15. Sycamore Ridge is a licensed Oklahoma wholesaler that may purchase and affix excise tax stamps of the State of Oklahoma.

16. During December of 2004, Sycamore Ridge did not affix excise tax stamps of the State of Oklahoma to the GRE manufactured cigarettes it purchased from Tobaccoville.

17. During December of 2004, Sycamore Ridge did not report any "units sold" of GRE manufactured cigarettes in the State of Oklahoma. GRE did not pay any escrow for any "units sold" of it[s] product in Oklahoma through Sycamore Ridge during December 2004.

18. . . . . The [Sycamore Ridge] bookkeeper advised the OTC that the original reports indicating 109,338,660 Oklahoma "units sold" of GRE manufactured cigarettes during 2005 were correct and should be accepted.

19. The 109,338,660 "units sold" of GRE manufactured cigarettes sold by Sycamore Ridge in the state during 2005 are included in the total of the 170,366,380 "units" of GRE manufactured cigarettes sold in the State of Oklahoma by licensed wholesalers during calendar year 2005.

20. [AG], using the statutory formula contained in the Escrow Statute, calculated GRE's 2005 escrow obligation for 170,366,-380 Oklahoma "units sold" to be $3,546,619.15.

21. AG notified GRE of the number of its "units sold" in Oklahoma during calendar year 2005 as well as its corresponding escrow obligation.

22. Despite the notification sent by AG to GRE regarding the 2005 Oklahoma "units sold" and corresponding escrow obligation, GRE only deposited $149,375.32 into its Oklahoma escrow account.

23. Fifteen (15) different licensed Oklahoma wholesalers submitted NPM Reports indicating a total of at least 84,152,040 "units sold" of GRE manufactured cigarettes in the State of Oklahoma during calendar year 2006.

24. AG, using the statutory formula contained in the Escrow Statute, calculated GRE's 2006 escrow obligation for 84,152,-040 Oklahoma "units sold" to be $1,804,396.46.

25. AG notified GRE of the number of its "units sold" in Oklahoma during calen-

dar year 2006 as well as its corresponding escrow obligation.

26. Despite the notification sent by AG to GRE regarding the 2006 Oklahoma "units sold" and corresponding escrow obligation, GRE only deposited $123,770.58 into its Oklahoma escrow account.

27. The State of Oklahoma has not made any claim for escrow payments against [Tobaccoville]. . . .

¶ 14 The trial court found "that the evidence presented by AG established that 170,-366,380 'units sold' of GRE manufactured cigarettes occurred in the State of Oklahoma during calendar year 2005," and "84,152,040 'units sold' of GRE manufactured cigarettes occurred in the State of Oklahoma during calendar year 2006."[5] It found that "[t]he 109,338,660 'units' of GRE manufactured cigarettes sold by Sycamore Ridge to retailers in the state during 2005 were 'units sold' attributable to 2005. GRE is responsible for depositing escrow for these 2005 Oklahoma 'units sold.'" It found that GRE's escrow obligation to the State of Oklahoma for 2006 is $1,804,396.46. Consequently, the trial court found GRE's deposit to be deficient in the amount of $3,397,243.83 for calendar year 2005, and $1,680,625.88 for 2006, and ordered GRE to place these amounts into its Oklahoma escrow account to satisfy its obligation for calendar years 2005 and 2006.

¶ 15 The trial court further found that because GRE violated the Escrow Statute during 2005 and 2006, a civil penalty should be imposed on GRE in the amount of $507,786.97, an amount equal to "10% of the total outstanding escrow deficiency of GRE for calendar years 2005 and 2006," to be paid to "the General Fund of the State of Oklahoma."

.¶ 16 The court concluded that, "[b]ased upon the foregoing, Judgment is hereby entered in favor of [AG] and against [GRE]. [GRE's] and [Tobaccoville's] claims are denied in their entirety, and Judgment is hereby entered in favor of [AG] and [OTC] on same."[6] From the April 2011 Order, GRE and Tobaccoville appeal.

## STANDARD OF REVIEW

¶ 17 In a non-jury trial, where the trial judge acts as the trier of fact, the "findings are entitled to the same weight and consideration that would be given to a jury's verdict." *Million v. Million,* 2012 OK 106, ¶ 8, 292 P.3d 21, 23. They "will not be disturbed on appeal where there is any evidence reasonably tending to support the findings. In addition, the credibility of witnesses and the effect and weight to be given to their testimony are questions of fact, not questions of law for the appellate court." *Id.*

¶ 18 Statutory construction presents a question of law, *State v. Tate,* 2012 OK 31, ¶ 7, 276 P.3d 1017, 1020, and, therefore, calls "for a legal conclusion to be governed by a *de novo* standard of appellate review. When reexamining a trial court's legal rulings, an appellate court exercises plenary, independent and non-deferential authority," *Native Wholesale Supply,* ¶ 9, 237 P.3d at 205 (footnotes omitted). "The fundamental rule of statutory construction is to ascertain the intent of the legislature. Words and phrases of a statute are to be understood and used not in an abstract sense, but with due regard for context, and they must harmonize with other sections of the Act." *Tate,* ¶ 7, 276 P.3d at 1020 (citation omitted).

¶ 19 Finally, alleged due process clause violations require independent, non-deferential *de novo* review. *See Fields v. Saunders,* 2012 OK 17, ¶ 1, 278 P.3d 577, 579.

## ANALYSIS

### I. Units Sold

¶ 20 GRE and Tobaccoville argue there is no evidence reasonably tending to support the trial court's findings that there were 170,366,380 units sold of GRE products in Oklahoma in 2005, and 84,125,040 in 2006, *because* certain NPM Reports constitute the only evidence presented by the State to support these figures, and these NPM Reports do not comply with the requirements of the

5. April 2011 Order, p. 6.

6. April 2011 Order, p. 8.

applicable Oklahoma Statutes for calculating units sold.[7]

¶ 21 Title 37 O.S.2011 § 600.22(10) defines "units sold" as follows:

"Units sold" means the number of individual cigarettes sold in the state by the applicable tobacco product manufacturer, whether directly or through a distributor, retailer or similar intermediary or intermediaries, during the year in question, as measured by excise taxes collected by the state on packs, or "roll-your-own" tobacco containers, bearing the excise tax stamp of the state. The [OTC] shall promulgate such rules as are necessary to ascertain the amount of state excise tax paid on the cigarettes of such tobacco product manufacturer for each year.

¶ 22 Accordingly, the number of units sold equals "the number of *individual cigarettes* sold," not the number of "packs" or "tobacco containers" sold. § 600.22(10) (emphasis added).[8] Furthermore, the number "sold in the state by the applicable tobacco product manufacturer" is to be "measured by excise taxes collected by the state on packs ... bearing the excise tax stamp of the state."[9]

■ ¶ 23 GRE and Tobaccoville argue that, pursuant to § 600.22(10), a "units sold" occurs when a stamp is purchased by a licensed Oklahoma wholesaler. In effect, they argue that the number of units sold in a year is to be measured by the number of stamps purchased in a year because, as all the parties agree, the excise tax is collected when the stamps are purchased. GRE and Tobaccoville argue that, as a consequence, the NPM Reports that are prepared by licensed Oklahoma wholesalers, and that reflect the number of cigarettes in packs to which stamps-possibly purchased in previous years-have been affixed during that year, do not provide an adequate basis for calculating units sold. In particular, GRE and Tobaccoville argue that "[a]ny escrow obligation ... for the cigarettes purchase[d] by Sycamore Ridge in 2004 must be part of ... [the] 2004 escrow obligation [and not the 2005 escrow obligation as the State alleges], because the State collected excise taxes for those cigarettes in 2004,"[10] the year Sycamore Ridge purchased the excise tax stamps.

¶ 24 We reject this argument because the relevant language in § 600.22(10) states that units sold are to be "measured by excise taxes collected by the state *on packs ... bearing the excise tax stamp of the state.*" (Emphasis added.) That is, § 600.22(10) requires that the number of units sold be measured by the number of "packs, or 'roll-your-own' tobacco containers, bearing the excise tax stamp of the state," and not merely by the excise taxes collected. Not only does GRE and Tobaccoville's interpretation disregard this language, but to interpret § 600.22(10) in this manner would result in the unworkable attempt to measure the number of cigarettes sold in Oklahoma by individual NPMs based on the number of stamps purchased by wholesalers prior to those stamps being affixed to any particular brand of cigarette.

¶ 25 We, therefore, agree with the State's assertion that "[i]t is true that the excise tax is collected when a stamp is purchased by a licensed wholesaler. However, after the tax stamps have been purchased, they still must be affixed to a pack of NPM cigarettes before a 'unit sold' upon which escrow is due

---

**7.** We note they do *not* make the factual argument that (if the NPM Reports are consistent with the applicable statute) the contents of the NPM Reports do not support the figures reached by the trial court. Instead, they make the legal argument that the method relied upon to calculate units sold in the NPM Reports is inconsistent with the applicable statute.

**8.** "Manufactured cigarettes are the most common tobacco product, representing around ninety percent of tobacco consumption." C.B. Buente, *Enforcement of State and Local Tobacco Excise Taxes After Hemi Group,* 2010 Colum. Bus. L.Rev. 529, 534 (2010) (footnote omitted).

**9.** Title 68 O.S. Supp.2003 § 305(A) states, in part, as follows:

Every wholesaler ... doing business within this state and required to secure a license as provided under Section 304 of this title shall, *upon withdrawal from storage, and before making any sale or distribution of cigarettes for consumption thereof, affix or cause the same to have affixed thereto the stamp* or stamps as required by Section 301 et seq. of this title.
(Emphasis added.)

**10.** Brief-in-chief, p. 16.

occurs." [11] We agree because when excise tax stamps are purchased from the OTC and the excise tax is thereby collected, the stamps could subsequently be placed on participating manufacturer cigarettes rather than on NPM cigarettes. Even if it were known that the stamps would be placed on NPM cigarettes, it would remain unknown how many packs of any particular NPM a wholesaler would take out of storage and stamp.

¶ 26 The State asserts that it "utilize[s] the NPM Reports submitted by licensed Oklahoma wholesalers as they are the only entities legally authorized to purchase and attach Oklahoma excise tax stamps," [12] and it asserts that this Court should not substitute its own judgment for that of any agency, particularly in the area of expertise which the agency supervises. In support, the State cites *Kifer v. Oklahoma Tax Commission,* 1998 OK CIV APP 34, 956 P.2d 162, which states:

> Rules and regulations enacted by administrative agencies pursuant to the powers delegated to them have the force and effect of law and are presumed to be reasonable and valid. The burden of establishing that an administrative rule is not reasonable or valid is on the party complaining of the rule. Great weight is to be accorded the expertise of an administrative agency, and a presumption of validity attaches to the exercise of expertise when an order of the agency is reviewed by a court. A court should not substitute its own judgment for that of an agency, particularly in the area of expertise which the agency supervises.

*Id.* ¶ 10, 956 P.2d at 165 (citing *Toxic Waste Impact Grp. v. Leavitt,* 1988 OK 20, 755 P.2d 626).

¶ 27 We need not substitute our judgment for that of the OTC because the interpretation of § 600.22(10) offered by GRE disregards plain language of the statute and, furthermore, would result in an unworkable method for calculating the number of cigarettes sold by individual NPMs in Oklahoma. We conclude the State's, and trial court's,

reliance upon NPM Reports is consistent with § 600.22(10). We further conclude that the trial court did not err by including in its calculations for the year 2005 the GRE cigarettes that were sold to the distributor, Sycamore Ridge, for which excise tax stamps had been purchased in 2004. After tax stamps have been purchased, they still must be affixed to a pack of NPM cigarettes to constitute a unit sold.

## II. Cigarettes Sold on Tribal Lands

¶ 28 GRE and Tobaccoville argue the trial court erred by including in its calculation of "units sold" GRE cigarettes sold on tribal lands. The trial court found that packs of cigarettes manufactured by GRE "which have a tax stamp issued by the State of Oklahoma affixed thereto and are sold in the State of Oklahoma by retailers owned, licensed, or operated by an Indian Tribe are 'units sold' upon which escrow is due." GRE and Tobaccoville assert that cigarettes sold on tribal lands do not require excise tax stamps and argue that no cigarettes sold on tribal lands should be included in the calculation of "units sold." The State argues that cigarette packs (and "roll-your-own" tobacco containers) sold on tribal lands properly bear excise tax stamps of the state and the cigarettes in these packs should be included in the calculation of "units sold" for purposes of determining the escrow obligation of GRE.

¶ 29 The United States Supreme Court has held that states have the authority to tax tribal retailers' sales to non-Indians. *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 483, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). *See Muscogee (Creek) Nat. v. Pruitt,* 669 F.3d 1159, 1173 (10th Cir.2012). More particularly, it has "held that requiring tribal retailers to affix tax stamps, collect a tax from non-Indian purchasers, and keep detailed records [are] permissible minimal burdens that [a] state [can] impose on [a] tribal retailer." *Pruitt,* 669 F.3d at 1173 (citing *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65

11. Answer Brief, p. 19 (emphasis omitted).

12. Answer Brief, pp. 19–20.

L.Ed.2d 10 (1980)). Furthermore, states have "a valid interest in collecting revenue," tribes have "no vested right to a certain volume of sales to non-Indians," and "tribal interests do not outweigh those of the state in this area." *Pruitt*, 669 F.3d at 1175 (citations and internal quotation marks omitted). That is, "[s]tates have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchase of tax-exempt cigarettes on reservations...." *Id.* (quoting *Dep't of Taxation and Fin. of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994)) (alteration in original).

¶ 30 In Oklahoma, 68 O.S.2001 § 349(A) [13] provides that cigarettes sold "at a tribally owned or licensed store" are to be taxed "in the amount of [75%] of the cigarette excise taxes ... which tax shall be in lieu of all sales and excise taxes on such cigarettes." [14] However, § 349(C) provides that "[a]ll cigarettes which are sold or held for sale at a tribally owned or licensed store *shall have affixed thereto a stamp or stamps* evidencing payment of the in lieu tax required by subsection A of this section." (Emphasis added.) *See also* 68 O.S. Supp.2004 § 346(C)(2) ("All cigarettes and tobacco products sold or held for sale to the public, without distinction between member and nonmember sales, *shall bear a payment in lieu of tax stamp* evidencing that payment in lieu of state taxes has been paid to the state.") (emphasis added).

¶ 31 In *Native Wholesale Supply*, 2010 OK 58, 237 P.3d 199, the defendant imported the same cigarettes at issue in the present case, and sold them to a tribal entity in Oklahoma:

Native Wholesale Supply imports Seneca brand cigarettes from [GRE].... The imported cigarettes are stored in several locations in the United States, including the Free Trade Zone in Las Vegas, Nevada.

Native Wholesale Supply then sells the cigarettes to tribal entities in the United States. One such tribal entity is Muscogee Creek Nation Wholesale in Oklahoma.

*Id.* ¶ 19, 237 P.3d at 207–208 (footnote omitted). After Native Wholesale Supply would sell the cigarettes to the tribal entity, the tribal retailers would sell the GRE manufactured cigarettes, at least in part, to the general public in Oklahoma. *Id.* ¶ 20, 237 P.3d at 208.

¶ 32 In determining "the interest of the State in adjudicating this matter in Oklahoma" for purposes of its personal jurisdiction analysis, the Court stated:

A decision adverse to the state on this issue would permit cigarette manufacturers and wholesalers to evade the MSA by setting up distribution networks whose participants pose as fully independent entities engaging in carefully structured transactions that ostensibly take place outside of the State. In this way, tobacco manufacturers and merchants could purposefully, albeit indirectly, target cigarettes at Oklahoma, reaping the economic benefit of engaging in the tobacco industry while evading the public policy embodied in the MSA and the Complementary Act of shifting the burden of tobacco-related health care costs from the State to the entities who profit from the smoking enterprise.

*Id.* ¶ 27, 237 P.3d at 209.

¶ 33 This same concern applies here. A decision in favor of GRE on this issue would allow it, by distributing its cigarettes to be sold only on tribal lands, to reduce its "units sold" to zero and thereby evade both its escrow obligation as an NPM, and "the public policy ... of shifting the burden of tobacco-related health care costs from the State to the entities who profit from the

---

**13.** Section 349 was superseded in 2010 by § 349.1. However, the law in effect at all times relevant to this case (i.e., 2005 and 2006) is § 349.

**14.** The intent of this provision is "to allow such tribes or nations or their licensees to make sales of cigarettes and tobacco products *to tribal members* free of state taxation." 68 O.S. Supp.2004 § 346(B) (emphasis added). Accordingly, and

pursuant to the law in effect at all times relevant to this case, "[a] federally recognized Indian tribe or nation may receive a refund for a portion of the tax imposed pursuant to the provisions of this section if it can provide sufficient documentation that sales of cigarettes to its tribal members exceed twenty-five percent (25%) of its total sales of cigarettes." 68 O.S.2001 § 349(B).

smoking enterprise." *Id.*[15] *See also Star Scientific Inc. v. Beales,* 278 F.3d 339, 361 (4th Cir.2002) ("[defendant] cannot deny that it is a cigarette manufacturer whose products will continue to threaten the public health."). Finding no countervailing statute or policy in favor of GRE and Tobaccoville's position on this issue, and consistent with United States Supreme Court precedent and the plain language of 37 O.S.2011 § 600.22(10), we conclude the trial court did not err by finding that packs of cigarettes manufactured by GRE "which have a tax stamp issued by the State of Oklahoma affixed thereto and are sold in the State of Oklahoma by retailers owned, licensed, or operated by an Indian Tribe are 'units sold' upon which escrow is due."

### III. Due Process

¶ 34 GRE and Tobaccoville argue that adequate procedural safeguards are absent from the Escrow Statute in violation of the due process clause of the Fourteenth Amendment of United States Constitution, which provides, in pertinent part, as follows: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.[16] In their appellate brief, GRE and Tobaccoville admit that "[t]he Escrow Statute is not a tax, but rather a public policy law that regulates the sale of cigarettes to consumers." [17] Nevertheless, they argue that the "process set forth in the Escrow Statute as to how the [AG] determines the assessment against the NPM (i.e. the amount to be placed in escrow by the NPM) does not provide for sufficient procedural safeguards to satisfy the require-ments of the Due Process Clause." [18] They assert that "the Escrow Statute does not afford the NPMs a meaningful remedy for an improperly exacted (or calculated) escrow payment. In fact, the Escrow Statute does not provide the NPMs with any effective means for challenging the amount of the escrow payment assessed against them by the [AG]." [19]

¶ 35 In *Grand River Enterprises Six Nations, Ltd. v. Pryor,* 425 F.3d 158 (2d Cir. 2005), GRE similarly argued that the escrow funds operate as unconstitutional prejudgment deprivations of property without due process of law and that they are entitled to a hearing before the funds are placed in escrow. The United States Court of Appeals for the Second Circuit rejected this procedural due process argument, stating:

> Appellants challenge the states' legislative, not adjudicative, actions, and "[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause." *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 142 (2d Cir.1994). Here, the escrow reserves are not specific to any particular litigation; rather, they are legislative preconditions for the privilege of engaging in future cigarette sales in the individual states. *See United States v. Fla. E. Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 ... (1973). The reserves are designed to ensure that funds are available should litigation *subsequently* begin and result in judgment against the manufacturers. Thus, the accounts are substantially different in kind from any

---

**15.** We note that the following difficulties *may* exist regardless of our determination:

> The sale of cigarettes on Native American reservations, in particular, has been a source of significant evasion in some areas. States do not have the power to tax sales on Native American reservations to registered tribe members. Sales to non-tribal members can be subject to taxation and generally are. *States have had great difficulty enforcing these taxes.* In *California Board of Equalization v. Chemehuevi Indian Tribe,* [474 U.S. 9, 12, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985),] the Supreme Court held that states could require tribes to collect these taxes but did not rule that states had the power to collect the taxes directly. Many tribal sellers refuse to collect these taxes,

arguing that their sovereign status allows them to sell cigarettes tax-free.
Buente, *supra* n. 8, at 541–542 (footnotes omitted) (emphasis added).

**16.** Although not raised by the parties, we note that the Oklahoma Constitution similarly provides, "No person shall be deprived of life, liberty, or property, without due process of law." Okla. Const. art. 2, § 7.

**17.** Brief-in-chief, p. 8.

**18.** Brief-in-chief, p. 21.

**19.** Brief-in-chief, p. 22.

individual prejudgment deprivation of property.

*Grand River Enterprises Six Nations, Ltd.,* 425 F.3d at 174 (alteration in original).

■ ¶ 36 In the same case, GRE "also contend[ed] that the Escrow Statutes violate their ... substantive due-process rights." *Id.* at 175.[20] The court found this argument "unavailing" because:

> the Escrow Statutes are rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses. *See, e.g.,* N.Y. Pub. Health Law § 1399–nn (declaring that it is in the interest of New York to establish an escrow fund because of public health concerns); *see also Star Scientific,* 278 F.3d at 350 (concluding that legislation is rationally related to legitimate state interest).

*Grand River Enters. Six Nations, Ltd.,* 425 F.3d at 175.

■ ¶ 37 Similarly, in *KT & G Corp. v. Attorney General of the State of Oklahoma,* 535 F.3d 1114, (10th Cir.2008), the court stated that to comport with the limited scope of substantive due process protection, economic legislation need only be rationally related to a legitimate government interest, and concluded that "Oklahoma's amended escrow statute is rationally related to the state's legitimate interests in promoting health and insuring the availability of adequate funds to address the state's future tobacco-related

health care costs." 535 F.3d at 1143 (citations omitted). We decline GRE's request to hold against the overwhelming majority of case law finding escrow fund acts, including Oklahoma's Escrow Statute, to be constitutional under due process analysis.[21]

### IV. Civil Penalty

■ ¶ 38 Pursuant to 37 O.S. Supp.2003 § 600.23(E)(1), the trial court ordered that a civil penalty be imposed against GRE in an amount equal to 10% of the total outstanding escrow deficiency of GRE for 2005 and 2006. GRE and Tobaccoville assert that a civil penalty requires a *willful* violation of the Escrow Statute, but that the circumstances show there was and is a legitimate dispute concerning the computation of the proper escrow amounts; therefore, they argue, the violation was not willful.

¶ 39 The State points out that the provision in question does not require a willful violation, but only a violation.[22] Moreover, GRE and Tobaccoville do not cite any authority in support of their argument. "Argument without supporting authority will not be considered." Okla. Sup.Ct. R. 1.11(k)(1), 12 O.S. 2011, ch. 15, app. 1. Therefore, we reject their argument.

### CONCLUSION

¶ 40 GRE and Tobaccoville appeal the trial court's "Order Nunc Pro Tunc of Findings of Fact and Conclusions of Law," filed on April

---

**20.** The due process clause includes both substantive and procedural components. *See Flandermeyer v. Bonner,* 2006 OK 87, ¶ 8 n. 2, 152 P.3d 195, 198 n. 2. *See also Nelson v. Nelson,* 1998 OK 10, ¶ 15 n. 26, 954 P.2d 1219, 1225 n. 26 ("The substantive component of the due process clause bars certain governmental action despite the adequacy of procedural protections provided.") (citations omitted). *But see* Peter J. Rubin, *Square Pegs and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights,* 103 Colum. L.Rev. 833, 848 (2003) ("Of course, substance and procedure cannot be so 'neatly separated,' " and, "[a]t the margin, at least, the distinction between substance and procedure blurs.").

**21.** *See also S & M Brands, Inc. v. Summers,* 393 F. SupP.2d 604, 621–37 (M.D.Tenn.2005) (upholding Tennessee's escrow statute and related tobacco laws against challenges under, among

other things, the due process cause), *aff'd, S & M Brands, Inc. v. Summers,* 228 Fed.Appx. 560 (6th Cir.2007); *Grand River Enters. Six Nations, Ltd.,* 425 F.3d at 175 (2d Cir.2005); *Grand River Enters. Six Nations, Ltd. v. Beebe,* 418 F. Supp.2d 1082 (W.D.Ark.2006) (finding no violation of the due process clause); *PTI, Inc. v. Philip Morris, Inc.,* 100 F.Supp.2d 1179 (C.D.Cal.2000) (finding no violation of the due process clause).

**22.** We note that § 600.23(E)(2) requires a "knowing violation," but was not relied upon by the trial court and is, therefore, not applicable. The trial court relied upon § 600.23(E)(1). Where there is a "knowing violation," the trial court may impose a higher penalty, up to 300% of the original amount improperly withheld from escrow. § 600.23(E)(2). A mere violation, however, is limited to no more than 100% of the original amount improperly withheld from escrow. § 600.23(E)(1).

20, 2011, denying their claims "in their entirety" and entering judgment in favor of the State. Based on our review of the record on appeal and applicable law, we affirm the Order.

¶ 41 **AFFIRMED.**

FISCHER, P.J., and WISEMAN, J., concur.